J-S09045-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.K.M., A MINOR CHILD | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.B., NATURAL FATHER | : | No. 1626 WDA 2018 |

Appeal from the Order Entered October 4, 2018
in the Court of Common Pleas of Cambria County
Orphans' Court at No(s):  2017-954 IVT

BEFORE:   PANELLA, P.J., LAZARUS, J. and STRASSBURGER, J.*,

MEMORANDUM BY STRASSBURGER, J.:                FILED APRIL 15, 2019

N.B. (Father) appeals from the order entered October 4, 2018, in the Court of Common Pleas of Cambria County, which terminated involuntarily his parental rights to his minor son, J.K.M. (Child), born in December 2013.[1]  We affirm.

The record indicates that Cambria County Children and Youth Service (CYS) first became involved with Child several days after his birth.  N.T., 8/15/2018, at 15.  At the time, Child was residing with Mother, with whom CYS had a prior history of involvement dating back to 2011.  Id.  Mother exhibited substance abuse and mental health issues, as well as parenting deficits and a lack of stable housing.  Id. at 16.  Child continued to reside with

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The order also terminated involuntarily the parental rights of Child's mother, S.M. (Mother).  Mother did not appeal the termination of her parental rights, nor did she participate in this appeal.

Mother until April 2014, at which point he went to live with a family friend while Mother "attend[ed] to her drug and alcohol concerns." Id. at 19. However, Mother overdosed on heroin on May 31, 2015, and Child began living with his maternal grandmother pursuant to a safety plan. Id. The juvenile court adjudicated Child dependent on July 28, 2015. Id. Child continued living with his maternal grandmother until she became unable to care for him due to an impending surgery. Id. at 19. He entered foster care on June 22, 2016. Id. at 16, 19.

Meanwhile, the record is somewhat unclear as to the role that Father played in Child's early life. Mother provided Father's name to CYS on June 9, 2015. Id. at 25. On July 6, 2015, Father contacted CYS and stated that he wanted to become more involved with Child. Id. at 25, 53, 60. After that date, CYS was unable to make further contact with Father. Id. at 25-27, 53, 60. Father did not reach out to CYS again, nor did he return CYS's phone calls. Id. at 60-63. Father visited Child while he was living with his maternal grandmother, but CYS did not know the extent of the visitation.[2] Id. at 46-

_____

[2] Father maintained that he visited Child at the maternal grandmother's home every day and continued to visit even after he learned that he was not allowed. Id. at 80-83, 94, 103-04, 108, 113-14. The caseworker testified that CYS was opposed to Father's visiting at the house of Child's maternal grandmother because Father was not cooperating with CYS and the visits violated the juvenile court's orders, which required Father to have supervised visits through CYS. Id. at 48-50. She agreed that Father was entitled to weekly visits at CYS and that CYS would have explained to him how to obtain visits if he had asked. Id. at 63-64.

50. After Child entered foster care, Father did not visit him at all. Id. at 26, 60. According to Father, he received a sentence of 6 to 20 months of incarceration in May 2016, but did not report for the start of his sentence and remained a fugitive until September 2016.[3] Id. at 122. The juvenile court changed Child's permanent placement goal from reunification to adoption on May 30, 2017. Id. at 24, 44. On April 2, 2018, the juvenile court found aggravated circumstances based on Father's failure to maintain contact with Child for six months. Id. at 30-31.

On October 27, 2017, CYS filed a petition to terminate Father's parental rights involuntarily. The orphans' court attempted to conduct a termination hearing on April 16, 2018. However, both Father and Mother appeared pro se, and the court appointed counsel and continued the hearing. Father, who was incarcerated at the time, reported that he was facing a new charge for possession of marijuana, and that his sentencing would occur on June 19, 2018, "so hopefully I'll be out then." N.T., 4/16/2018, at 23.

---

[3] Father testified that he has been on probation since 2011 and that he was incarcerated from May 2013 until the day Child was born in December 2013. N.T., 8/15/2018, at 82, 85, 96-97. Father's criminal record indicates that his 2013 sentence resulted from guilty pleas to two separate charges of criminal trespass. CYS Exhibit 14. Father violated his probation in May 2014, and received a sentence of 20 days to 12 months of incarceration. Id. Father's sentence in May 2016 resulted from guilty pleas to possession of a controlled substance and theft by unlawful taking. Id.

CYS filed an amended termination petition on August 13, 2018, in order to correct a typographical error. The orphans' court conducted the continued termination hearing on August 15, 2018.[4, 5] Notably, Father was once again

_____

[4] The transcript of the hearing lists the date incorrectly as August 15, 2017.

[5] The orphans' court appointed Christopher Gvozdich, Esquire, as Child's legal counsel during the termination proceedings. Attorney Gvozdich also served as Child's guardian ad litem, insofar as he represented both Child's legal and best interests. See N.T., 8/15/2018, at 6-9 (Attorney Gvozdich discussing whether he could represent Child's legal and best interests without conflict).

Attorney Gvozdich reported that Child, who was four-and-one-half-years old, did not appear to remember Father and that he was adamant that he wanted to continue living with his pre-adoptive foster parents. Id. at 8-9, 128-33. Specifically, Attorney Gvozdich explained that he asked Child numerous questions in an effort to ascertain his preferred outcome regarding termination of Father's parental rights. Child did not seem to understand the questions. Attorney Gvozdich recalled as follows.

> Then I started trying to get more specific into [Father] and [Mother] to try to really gauge what his feelings were and his thoughts were, if any, on that. I tried to make it very clear I was not referring to -- I started asking questions about [Father]. Tried to make it clear as I possibly could, I am not talking about the dad you live with, I am talking about your other dad, [Father]. Your other dad. Not the dad you live with. I tried everything I could think of. But he seemed confused when I would say that. No matter how I would try to rephrase it as, he couldn't really acknowledge anybody other than the dad he lives with.

> He then asked me -- I asked him does he ever see [Father]. He wasn't able to really say that. I then tried to change tactics and ask when and how often he sees him. All I got was I go to Jurassic Park with my dad. I asked again, you mean the dad you live with and he said yes. I couldn't get anything out of him there.

> I asked him again do you remember the last time you saw your other dad [Father], the dad -- not the dad you live with. His

- 4 -

incarcerated at the time of the hearing. Father stated that he was released on June 4, 2018, and reported for sentencing on his possession charge, but that "somehow the OTN number didn't match up so I owed [] some time ...." Id. at 14, 78-79, 91. He stated that he would be released on November 28, 2018, and that he would "max out probation in four months." Id. at 91, 100. On October 4, 2018, the court entered an order terminating Father's parental rights. Father timely filed a notice of appeal on October 18, 2018, along with a concise statement of errors complained of on appeal.

Father now raises a single claim for our review. "Whether the [orphans' c]ourt properly found by clear and convincing evidence that [CYS] presented sufficient evidence to support termination of the parental rights of [] Father." Father's Brief at 1.

We address Father's claim mindful of the following standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported

_____

response was it is a Stegosaurus, so again more Jurassic Park. I couldn't get anything out of him. I asked him what kind of things did you do on your visit with your other dad, with [Father], what kind of places did you go, were you happy when the visits were going on, were you sad. More Jurassic Park discussion.

N.T., 8/15/2018, at 130-31. Attorney Gvozdich filed a brief arguing in support of termination on appeal. We are satisfied that Attorney Gvozdich sufficiently represented Child's legal interests. See In re Adoption of C.J.A., ___ A.3d ___, 2019 WL 615809, at *4 (Pa. Super. 2019) (concluding that the child's counsel provided sufficient representation of his legal interests where counsel explained that the child did not remember his father and believed that his stepfather was his biological parent).

- 5 -

by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. See 23 Pa.C.S. § 2511. It requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the orphans' court terminated Father's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a) as well as subsection 2511(b) to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Here, we analyze the court's decision pursuant to subsections 2511(a)(1) and (b), which provide as follows.

- 6 -

(a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

(b) Other considerations.  The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

* * *

23 Pa.C.S. § 2511(a)(1), (b).

We consider first whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(a)(1).  To meet the requirements of that subsection, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties."  In re Z.S.W., 946 A.2d 726, 730 (Pa. Super. 2008).  The court must then consider the parent's explanation for his or her abandonment of the child,

in addition to any post-abandonment contact. Id. We have emphasized that a parent does not perform parental duties by displaying a merely passive interest in the development of a child. In re B.,N.M., 856 A.2d 847, 855 (Pa. Super. 2004). Rather,

> [p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

Id. (citations omitted).

Of particular importance to this appeal, incarceration does not relieve a parent of the obligation to perform parental duties. Our case law does not require that an incarcerated parent "perform the impossible." Id. at 857. However, that parent must utilize the resources available in prison to preserve a relationship with his or her child. Id. at 855; see also In re Adoption of S.P., 47 A.3d 817, 828 (Pa. 2012) (discussing In re Adoption of McCray, 331 A.2d 652 (Pa. 1975)).

In its findings of fact accompanying the order on appeal, the orphans' court concluded that Father refused or failed to perform parental duties during the six months immediately preceding the filing of the termination petition on October 27, 2017. Order, 10/4/2018, at ¶ 14. The court reasoned that Father

failed to maintain contact with Child and CYS. Id. at ¶¶ 5-6, 11. While Father "talked a good game," he provided no resources for Child. Id. at ¶ 16. The court further reasoned that Father had been incarcerated repeatedly since 2013 and took no steps to overcome the obstacle of his incarceration. Id. at ¶¶ 12, 16.

In response, Father asserts that the orphans' court erred by terminating his parental rights to Child because CYS never gave him the opportunity to "involve himself in the services which may have prevented the termination from moving forward." Father's Brief at 2-3. He maintains that CYS did not seek him out and, once it located him, did not offer him the services necessary to achieve reunification. Id. at 3, 6-7. He also maintains that he had regular contact with Child prior to Child's placement in foster care. Id. at 3, 6.

Upon review, we discern no abuse of discretion or error of law. During the termination hearing, it was undisputed that Father had not visited with Child or contacted him in any other way since Child's placement in foster care on June 22, 2016. Moreover, Father had only minimal contact with CYS. Father contacted CYS once on July 6, 2015, and did not respond to CYS's attempts to reach him. His only other contact occurred when caseworkers met with him in prison on March 6, 2018. N.T., 8/15/2018, at 15. Caseworker Carol Crouse recalled this meeting as follows.

> And we had met with [Father] to serve him notification of the hearing that was to take place in April of 2018 and at that time [Father] became irate and he threw our papers at us and left the

office we were meeting with him in. And when we came back to the office, I immediately put it in an envelope and I mailed it to him certified to the prison.

Id.

Critically, Father also admitted on cross-examination that he made no effort to contact Child or CYS after June 22, 2016. He conceded that he made only a single phone call to CYS on July 6, 2015. Id. at 112-13. He further claimed that he went to the CYS office after the call and provided a urine sample. Id. at 81-82. According to Father, "[t]hey said they had some things they were going to set up for me as far as how I can get involved ... but after that ... nothing really happened." Id. at 83, 89, 104, 111-15. Throughout Father's testimony, he emphasized that he visited Child at the maternal grandmother's residence prior to June 22, 2016. Id. at 79, 103-04, 108, 110-13. When asked why he did not attempt to contact CYS and arrange visits with Child after June 22, 2016, Father first blamed his incarceration and stated that he "was caught up in a lot of things." Id. at 108-09. When asked that same question later during the hearing, his response was simply, "I don't have an answer for that." Id. at 116. Then, he added, "I don't know. Maybe I was flabbergasted with what's going on. That's the best I can come up with.... I was a little flabbergasted." Id.

Accordingly, the record confirms that Father refused or failed to perform parental duties during the six months immediately preceding CYS's filing of the termination petition on October 27, 2017. Father did absolutely nothing

to maintain contact with Child during the relevant six months. Moreover, while Father's incarceration may have been an obstacle, which limited his ability to maintain contact with Child, he did nothing to overcome that obstacle. See B.,N.M., 856 A.2d at 858-59 (finding the appellant's desire to preserve his parental rights insufficient, where he failed to act affirmatively to foster a relationship with his child while incarcerated, and where there was little indication in the record of a proactive desire to take on the role of a parent in the child's life).

We also reject Father's assertion that CYS failed to provide him with sufficient reunification services. In In re D.C.D., 105 A.3d 662 (Pa. 2014), our Supreme Court held that reasonable reunification efforts are not required to terminate parental rights involuntarily pursuant to subsection 2511(a)(2). The Court reasoned that the plain language of subsection 2511(a)(2), even when read in conjunction with section 6351 of the Juvenile Act, did not impose such a requirement. Id. at 671–75. While the Court focused its analysis on subsection 2511(a)(2), we find its reasoning equally applicable to subsection 2511(a)(1), as nothing in the language of that subsection requires reasonable reunification services either. Thus, we affirm pursuant to subsection 2511(a).

Next, we consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(b). Initially, we note that Father waived any challenge to subsection 2511(b) by failing to develop it in his brief. In re M.Z.T.M.W., 163 A.3d 462, 465-66 (Pa. Super.

2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). Nonetheless, even if Father had preserved such a challenge, it would be meritless. The requisite analysis is as follows.

> S[ubs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

In this case, the orphans' court found that Child has no bond with Father due to their lack of recent contact, and that Child is instead bonded with his pre-adoptive foster parents, indicating that termination of Father's rights would not negatively affect Child. Order, 10/4/2018, at ¶ 16. The record

supports the court's finding. As noted supra, Child, who was four-and-one-half-years old at the time of the hearing, had not seen Father since he was two-and-one-half-years old. The record also confirms that Child had a parental bond with his pre-adoptive foster parents. Id. at 33, 59. Child is doing well in his foster home. Id. at 32. Thus, terminating Father's parental rights would best serve Child's needs and welfare. See T.S.M., 71 A.3d at 269 (emphasizing the need to expedite the placement of dependent children "in permanent, safe, stable, and loving homes.").

Based on the foregoing, we discern no error of law or abuse of discretion by the orphans' court. Therefore, we affirm the October 4, 2018 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/15/2019